**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5386-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHRISTOPHER T. BROWN,

     Defendant-Appellant.

_____

Submitted June 2, 2021 – Decided June 16, 2021

Before Judges Haas, Mawla, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Indictment No. 16-05-0181.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele A. Adubato, Designated Counsel, on the brief).

Renee Robeson, Hunterdon County Prosecutor, attorney for respondent (Jeffrey L. Weinstein, Assistant Prosecutor, on the briefs).

Appellant filed a pro se supplement brief.

PER CURIAM

Defendant Christopher T. Brown appeals from his convictions of third-degree conspiracy to possess a controlled dangerous substance (CDS) with intent to distribute, N.J.S.A. 2C:5-2(a)(1), N.J.S.A. 2C:35-5(a)(1), and N.J.S.A. 2C:35-5(b)(3); and third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3). We affirm.

On March 28, 2016, police responded to a call regarding a possible drug overdose and discovered Mitchell Levine deceased. The cause of death was later determined to be a heroin overdose. Near Levine's body, police recovered heroin, drug paraphernalia, and his cell phone.

Pursuant to a search warrant, Hunterdon County Prosecutor's Office Detective Brian Jados analyzed the information from the cell phone and identified twenty text messages sent on March 24 and 25, 2016, between Levine's device and a number ending in 1129, which had no associated name. However, the first message sent from Levine to 1129 said, "Hi Chris. How is it going?" Then the following conversation took place:

> 1129: You still want the two.
>
> Levine: No, I can't swing the money between my hospital bills and my car. I don't know how I'm even going to pay all of them. Can you do one?

1129:  Yeah.

Levine:  Call me.

Levine:  What time do you think you'll have it?

1129:  Probably going to be some time later because now my man saying he waiting on it himself.

Levine: Okay.  Let me know when you hear anything.

1129:  Got you.

Levine:  Awesome.

Levine:  Did you get it?

1129:  On my way.

Levine:  How long?

1129:  45 minutes.

Levine:  K.

1129:  Pulling up.

Hunterdon County Prosecutor's Office Lieutenant Ryan Neiber examined the entirety of the thread and determined the conversations could be evidence of drug activity.  The conversations between 1129 and Levine showed the last drug transaction occurred three days before Levine's body was discovered.

Pursuant to a communications data warrant, police obtained permission to use Levine's telephone and pose as Levine.  Neiber began communicating with

3

1129 in order to arrange a drug buy.  On April 3 and 4, 2016, the following text

correspondence occurred:

> 1129:  Hey, Mitch, how is it going need to borrow $500,000 till Wednesday, but I'll settle for $500 if possible.
>
>    . . . .
>
> 1129:  Hey, what's up, Mitch?  I still need that favor if you can help me out.  Let me know if you can while it's still early, okay?
>
> 1129:  You up yet?  Did you get my message?  Let me know something if you can't or can or you can just need to know.
>
> Neiber (as Levine):  Hey Chris, how is it going?
>
> 1129:  What's up, Mitch?
>
> Neiber:  Will you be able to get here tomorrow?
>
> 1129:  Weather supposed to be bad but I'll try.
>
> Neiber:  Let me know as soon as you can.
>
> Neiber: Weather is going to be bad.
>
> 1129:  Okay.  Will do.  What you getting into today?
>
> Neiber:  Can you get to?
>
> 1129:  Yeah, I got it.
>
> Neiber:  A long way back from CT.

A-5386-17

1129:  Okay.  Let me know when you get home.

Neiber:  Going to be late.

1129:  What time do you think?

Neiber:  My friend driving we just left and he's looking to stop for food.

1129:  Okay.  What times are you thinking you'll be here?

Neiber:  Around 11:00.

Neiber:  Just left.

Neiber:  I looked at weather looks like just showers in the morning.

Neiber:  You thin [sic] you can be here by 10:00, 11:00?

1129:  Well, we'll try in the morning.

Neiber:  Okay.

1129:  I might be up by you so still let me know when you get home, okay.

Neiber:  K.  Cool.

Neiber:  Hey Chris, we've been at eh [sic] garage for about [two] minutes with my friend's car.  It's not looking go [] for tonight.  Are you still out my way?

Neiber:  And my phone is going to die.

1129:  Yeah, but I didn't bring anything with me.

A-5386-17

Neiber: Okay. Looks like tomorrow anyway. This guy is swapping out the alternator for us.

Neiber: Hope to be back on the road soon.

1129: No problem.

Neiber: I will get you in the morning. Thanks.

1129: Hey, did you make it home yet?

Neiber: What a night. You awake?

1129: What's up? Yeah. What's up?

Neiber: You going to make it out this morning?

1129: What you need.

Neiber: Two or three.

1129: Two or three[?]

Neiber: Can you do three if not two.

　　　. . . .

1129: How much you got?

Neiber: 700.

　　　. . . .

1129: Give me a sec.

Neiber: K. I'm counting on you.

A-5386-17

1129:  Let me check.  Are you going to be able to do what I asked you?

Neiber:  I got you.

1129:  Okay.  Let me see if [I can].  The guy I got the last stuff from I know he's not going to [do] that though because he told me he pays 175, $175 for that.

Neiber:  Then two, I'm starting to get sick.

. . . .

Neiber:  Let me know when you hear anything.

Neiber:  Did you get it?

Neiber:  Please answer me.

Neiber:  Chris, I hate to keep bothering you but just let me know if you're going to make it here today.  Thanks.

1129:  On my way, Mitch.  I fell asleep.

Neiber:  Thanks.

1129:  Oh, I hear getting now do you still want three cause he said he'll do it.

Neiber:  Yes, thanks.

1129:  Okay.  See you in a few.

Neiber:  Thanks.

Neiber:  You getting close?

. . . .

7

A-5386-17

1129: Had to stop to get my tire checked.

Neiber: K. How long?

1129: About [forty-five].

Neiber: K.

1129: Ten minutes.

Neiber: K.

Neiber: Come in. I have my electrician here.

1129: Outside.

Neiber: Come in.

1129: Garage closed.

Neiber: Come around back.

1129: Huh?

Neiber: Around my house.

At that point, defendant exited his car and walked toward the back of Levine's residence and was confronted by a SWAT team. After police identified themselves, defendant attempted to flee, but was apprehended. Defendant was arrested and searched. Police recovered three bricks of heroin and two cell phones from his person.

A-5386-17

At police headquarters, defendant voluntarily waived his Miranda[1] rights, and gave an audio recorded statement. Defendant admitted knowing Levine and supplying him heroin.

On May 12, 2016, a grand jury indicted defendant for conspiracy to possess CDS with intent to distribute on April 4, 2016, contrary to N.J.S.A. 2C:5-2(a)(1), N.J.S.A. 2C:35-5(a)(1), and N.J.S.A. 2C:35-5(b)(3) (count one); possession of CDS with intent to distribute on April 4, 2016, contrary to N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3) (count two); and two counts of obstruction of the administration of law, contrary to N.J.S.A. 2C:29-1(a) (counts three and four). On September 15, 2016, a grand jury returned a second, separate indictment charging defendant with strict liability for drug-induced death, contrary to N.J.S.A. 2C:35-9(a) (count one); and distribution of CDS or possession with intent to distribute on March 26, 2016, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3) (count two).

Originally, defendant was represented by private defense counsel. In May 2017, counsel moved to be relieved.[2] Counsel explained he was only retained

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] An attorney from the Office of the Public Defender was also present in anticipation of assuming defendant's representation when private defense counsel moved to be relieved.

to defend the charges in the first indictment, and with respect to those charges, a plea bargain had been offered.  Subsequently, however, the second indictment charged defendant with strict liability for a drug-induced death, and the State indicated it intended to use defendant's guilty plea on the CDS charges in the strict liability case.  Defense counsel explained he was concerned about this development and thought "it would make sense to have the [Public Defender's Office] substitute in on both cases."

The motion judge asked defendant how he felt about the motion to be relieved, and defendant replied he "didn't know."  The judge then explained why defense counsel sought to be relieved as follows:

> I'm sure [private defense counsel] went through with you the ramifications if you pled guilty on the one, which was your intent today.  It's my understanding you wanted to plead guilty, but you wanted new representation on the other case which, obviously has more significant consequences than the first one.  What the [p]rosecutor has proposed is that he would . . . file a motion and attempt to use what was in that case, your guilty plea or whatever else, and I don't know all the details in that case, but the fact that if you pled to possession with intent to distribute, the deceased person, . . . he would then attempt to have the [c]ourt admit[ it] in the second case, the strict liability case. All right?
>
> And then the [c]ourt . . . would hear argument and make a decision.  So what [private defense counsel is] indicating is that it is probably better that one attorney

10

handles both cases because they'll have a fuller understanding. They can speak to you about it and make recommendations to you[.]

Are you in agreement with that?

After further clarification, defendant explained he was satisfied with private counsel's services and wanted to plead guilty to the CDS charges, since that was the last date the State would accept a plea, and have the Public Defender represent him on the strict liability charge.

The motion judge also learned defendant lacked the funds to pay private counsel in either case. Private defense counsel explained as follows:

> I have to be asked to be relieved. A certain amount was agreed to for pretrial services, and that full amount has not been paid, and the pretrial services in this case have been extensive, involving motion practice, extensive discovery review, and I don't even know how many times we've been to court already, pretrial.
>
> . . . .
>
> But it's off the charts. And we haven't even scheduled these cases for trial yet. So I would end up trying both cases free, for absolutely no payment.
>
> . . . .
>
> I'm a solo practitioner. That would be an extreme economic hardship on me. . . . I have to ask to be relieved at this point.

11

The State reiterated the plea offer, namely, defendant would plead guilty to the CDS charges in exchange for a recommended sentence of five years imprisonment with a two-and-one-half-year-period of parole ineligibility. If defendant accepted the offer, then the State would proceed to trial on the strict liability charge. The State also offered a global resolution, stating it would allow defendant to plead guilty to all charges in exchange for a recommended sentence of seven years with an eighty-five percent period of parole ineligibility. The State advised the offers would remain available until the start of trial. The State also emphasized "the offer won't change" regardless of attorney. The motion judge entered the order relieving private defense counsel and substituting the Office of the Public Defender to represent defendant on both cases and adjourned the matter for approximately two weeks to enable defendant to consider the State's offer and consult with his public defender.

The matter returned to court on May 26, 2017, for a pre-trial conference. Defense counsel indicated it was defendant's intention to enter a plea on the first indictment. The State indicated it would not rescind the plea offer, but expressed concern that it could not use defendant's plea in the first indictment as evidence to prove the second indictment. The State informed the judge it intended to file various pre-trial motions, including a motion to join the indictments and would

12

await the judge's ruling before proceeding with the plea. Defense counsel also announced he intended to file certain motions, including a motion to dismiss the indictment and sought an adjournment to review the grand jury transcripts.

The State explained the joinder issue during the following colloquy with defense counsel:

> [Defense counsel]: I was going to ask, you know, why that decision was made at this stage in the process, why it hasn't been done sooner.
>
> [Prosecutor]: Well I think it's because in discussions with the previous [defense] attorney there was always discussions of a plea. And we're at [pre-trial conference] number four I think. And we do have concerns about the overlapping investigation in both indictments. We want to protect both cases. It seems more likely now that we're going to go to trial based on the strict liability case. And I want to protect the evidence from both. I think that . . . if he does end up pleading on the one indictment, there will be many pretrial motions that we'll have to go through. And I think my case can be preserved. But I think at this time consolidation is necessary to preserve my case and . . . to a way forward[,] pending the judge's decision.

Before adjourning the matter, the judge confirmed what the State's plea offer would be in the event she granted the consolidation or denied it for defendant's benefit in the following colloquy:

> [Prosecutor]: . . . [I]f you grant our motion to consolidate the two indictments, then the offer of the seven [years] on the consolidated indictment would still

remain. But if your decision is to deny it, then the offer on the two separate indictments will still remain the same.

[The Court]: So it doesn't change anything.

[Prosecutor]: It doesn't change anything. We just want the opportunity to join them together.

The judge adjourned the matter in anticipation of the parties' respective motions.

Defendant filed a motion to suppress his statement to police and the evidence recovered from Levine's phone. The State moved to join the indictments. The judge heard the motions over the course of several days in August 2017.

Defendant asserted the discovery of Levine's cell phone did not justify the issuance of a telephonic search warrant because under the circumstances there were no "valid concerns that evidence will be destroyed." He argued the second warrant giving police permission to use the phone to communicate with defendant "implicated the Wiretap Act[3], and . . . [police] should have been required to comply with, and obtain a warrant pursuant to that statute." He asserted the request for the warrant did not "fall into the 'law enforcement' exception of N.J.S.A. 2A:156A-4(b) because the officer communicating with

---

[3] New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 to -37.

defendant was not truly a 'party to the communication' because he was acting as Levine." Defendant asserted "the text messages between the officer and defendant constitut[ed] an 'intercept' within the meaning of the Wiretap Act because the officer assumed a dual identity and converted his communications into an intercept."

The motion judge ruled there was probable cause to issue the warrant because police made the request on the "belief that information pertaining to who sold Levine the heroin in question would be discovered on his phone . . . ." The judge concluded there was an exigency for the telephonic warrant because

> despite the fact that the scene was thoroughly secured and there was no risk that evidence on the phone would be destroyed, the investigation was still unfolding and the officers had no way of knowing how quickly word of Levine's death would spread to his acquaintances, and potentially the person who supplied him with the heroin which cause[d] his death. . . . Obtaining the warrant telephonically allowed the officers to begin investigating Levine's death immediately without the fear of interference.

As for the second warrant, permitting Neiber to use Levine's phone, the motion judge found

> the text message exchange between defendant and . . . Neiber was not an "interception," because it does not qualify as an "intercept" as defined by the New Jersey Wiretap Act. Furthermore, . . . a [w]iretap [o]rder was not required because the communication falls within

15

A-5386-17

> N.J.S.A. 2A:156A-4(b)'s exception for communications to which a law enforcement officer is a party.

The motion judge also conducted a hearing on defendant's motion to suppress his statements to police. Neiber testified that prior to administering defendant his <u>Miranda</u> warnings, police reviewed his pedigree information, namely, his "name, date of birth, social security number, identifying marks, employment, [and] place of birth." Defendant also provided his phone number, which was not the same as the number communicating with Levine's device. Then, according to Neiber, after defendant was given the <u>Miranda</u> warnings, he waived them orally and in writing and the interview about the events that had taken place prior to defendant's arrest proceeded. At first, defendant was not made aware of Levine's death and was not informed of the charges until near the end of their discussion.

Defendant argued his statement should be suppressed because the pedigree information police elicited prior to the <u>Miranda</u> warnings, including his nickname and phone number, was incriminating because it was relevant to the investigation. He argued his statement was not voluntary because he was not informed Levine was dead or of the charges until he had given police incriminating statements.

The motion judge denied the motion, concluding the information was not incriminating, but instead "objectively ministerial in nature and did not indicate any substantive relation to the investigation." The judge also found as follows:

> The detective did not deliberately mislead the defendant. The defendant never requested an attorney nor did he invoke his right to remain silent. . . .
>
> Furthermore[,] the State has proven beyond a reasonable doubt that the defendant knowingly and intelligently waived each and every right before making a statement and the defendant neither invoked nor attempted to invoke any of these rights thereafter.

The State argued the judge should join the cases because they were part of the same transaction and the indictments came separately because the evidence from the first indictment, namely, the information extracted from Levine's telephone, led to the identification of defendant as the suspect in the second indictment for the strict liability offense.

The motion judge granted the State's motion for joinder and in a written decision found as follows:

> The joinder of these indictments is not used to merely bolster the evidence in one trial, or show that defendant has a propensity to distribute drugs; the two [indictments] are part of the same case, and the evidence of each is highly probative of the other, and thus is not outweighed by the potential prejudicial effect.

A-5386-17

. . . .

> . . . The State, in presenting [the first indictment], would be at a loss to present the complete picture without being able to provide to the jury the basis for identifying the defendant on trial as the "Chris" in the text messages. Without a full explanation of the investigation describing how the investigators communicated with "Chris" to obtain evidence as to Levine's supplier, the full picture of the first crime could not be shown to the jury.

Defendant filed a second motion to suppress, challenging the warrantless search of Levine's home arguing there was an expectation of privacy and police could not enter Levine's home and remove the heroin and Levine's cell phone without a warrant. Defendant also filed a motion to dismiss the indictments.

The motion judge began to hear the matter when defense counsel informed her defendant had filed an ethics grievance against the prosecutor and "filed something with the Office of Judicial Ethics[4] in connection with [the judge]." The judge took a recess and returned to advise as follows: "Due to the fact that this [c]ourt was put on notice that there was a grievance filed regarding judicial ethics against this [c]ourt I have spoken to my presiding judge . . . [and] he wants everyone . . . over [and] he'll hear the motions himself today."

---

[4] The motion judge surmised that defense counsel meant defendant filed a complaint with the Advisory Committee on Judicial Conduct.

A-5386-17

The parties appeared before the Presiding Judge of the Criminal Part[5] who stated he advised the motion judge "responsibility for the matter going forward would be assumed by [him], lest there [was] an opportunity hereafter for anyone to question or complain about [the motion judge] presiding over this matter." The judge explained he assumed responsibility for the case "in order to avoid, even potential issues hereafter, from having to be dealt with so that we could focus on the substantive matters before the [c]ourt." Neither party objected to the trial judge's decision.

The trial judge stated he read the parties' motion pleadings and was prepared to proceed. Following nearly three hours of oral argument, the judge denied defendant's motion to dismiss, concluding as follows:

> This indictment is not manifestly deficient or palpably defective. . . .
>
> . . . [I]n determining the sufficiency of the evidence to sustain an indictment, every reasonable inference is afforded to the State's evidence.
>
> . . . .
>
> Defendant is charged with strict liability drug-induced death. The elements are that the defendant distributed or dispensed the CDS, he acted knowingly or purposely in doing so. The victim ingested the CDS and died as a result. The State has presented some

---

[5] The presiding judge tried the case and was also the sentencing judge.

A-5386-17

evidence that the substance in question was a CDS, specifically heroin, and I've indicated that. Also, the State presented evidence that the defendant possessed the substance and that he had the intent to distribute it, purposefully and knowingly. And then, finally evidence that the . . . decedent died as a result. For all of the foregoing reasons, and the totality of the circumstances, . . . the motion of the defendant is denied.

Regarding the suppression motion, the trial judge found defendant had standing to challenge the search, but adjourned the matter to the following day to continue the hearing. When the matter returned the following day, the judge indicated he reviewed all of the submissions and the materials in the case at length. The judge denied the suppression motion and rendered the following oral decision:

Here, this isn't the typical case in which a defendant seeks suppression of property found in his home or in a place in which he has a proprietary or possessory interest. Here, defendant asserts his right to privacy in the home of another, specifically in the home of his alleged customer, and in the property seized, that is the heroin, which he allegedly sold to the decedent days before [his] demise. That expectation of privacy is both subjective in the extreme and unreasonable. . . . [U]nder all of the circumstances, the defendant has not established a reasonable basis to hold the subjective expectation of privacy which he claims and the object of the search, that is in the heroin, because he allegedly sold it, . . . disposed of it and had transferred possession, right, title[,] and interest to it to . . . Levine.

20

. . . .

The State argues [defendant] abandoned the property. I don't know that he abandoned it, but he certainly relinquished his right, title[,] and interest to it. Such as he had no continuing interest in the property seized at the time of the search. . . .

There is nothing in the record before this [c]ourt, or as presented by the defendant, that would support his claim of a reasonable expectation of privacy in the heroin, in . . . Levine's home, or further and finally, in the decedent's telephone. A point was made that the phone was seized. Indeed it was. But while [defendant] might have had a reasonable expectation of privacy as to his . . . electronic communications with . . . Levine, he had no reasonable expectation of privacy in the physical phone itself which was the subject of seizure as a result of the warrantless search. . . .

Finally, . . . the fact that the defendant had been there does not give him an expectation of privacy in the place. He wasn't leaving a suitcase belonging to him, which he intended to store at . . . Levine's apartment, for example, in which he might have retained an expectation of privacy. He was just an itinerant guest, commercial guest at that, . . . or business invitee, in . . . Levine's home. He had no interest in the place and he had no expectation of privacy in the property, that is the heroin, nor where it was found or used for the purpose of constitutional analysis.

21

A-5386-17

Following the judge's ruling,[6] defendant asserted the motion judge represented that regardless of the outcome of the joinder motion, the State's plea offer of "a five with a two" would stand. The trial judge informed defendant he was not involved in the prior proceedings and should discuss the matter with defense counsel.

The next pre-trial conference occurred in January 2018. Defendant again addressed the withdrawal of private defense counsel, and claimed it "wasn't about financial reasons. It was about strategic reasons." Defendant claimed he wanted to plead guilty to the CDS charges, but there was a disagreement "that arose between [him] and [private defense counsel.]" Defendant objected to private counsel being relieved because "it gave [the] State an opportunity then to file a motion to join the two indictments together before [defendant] could plead guilty" to the CDS charges. Defendant claimed "there was only one plea offer on the table and that was to both indictments." He argued because the Public Defender was allowed to take his case against his wishes, his right to counsel was violated.

The trial judge found

---

[6] The trial judge also denied a subsequent motion for reconsideration of the decision on the suppression motion.

A-5386-17

[private defense counsel] wasn't jettisoned from the case, barred from proceeding or otherwise prevented from representing [defendant]. He moved for that relief and it was agreed by consent of the State and defendant that . . . [counsel] would be relieved as counsel, and the Office of the Public Defender would be substituted. That was an [o]rder signed May 5, 2017. That bell has been rung.

After rejecting defendant's argument, the trial judge reviewed with defendant the indictments and the State's plea offer, which was to plead guilty to reckless manslaughter in return for the State's recommendation of a sentence of a maximum of seven years in prison, with an eighty-five percent period of parole ineligibility, and merge the second indictment into the first. The judge explained in detail defendant's sentencing exposure and that he was eligible for an extended sentence if a jury convicted him of the charges. Defendant acknowledged he understood the judge's explanation and rejected the offer.[7]

Following N.J.R.E. 104 hearings in March 2018, a jury was selected, and defendant's trial was scheduled for April 2018. On the first day of trial, prior to opening statements, the State moved in limine for a ruling permitting it to

---

[7] The transcript also briefly addresses a motion by defendant to sever trial of the indictments, evidenced by the following solitary comment by the judge near the end of the proceedings: "And the severance motion you'll do as you please. But having granted the motion to join that may not be optimistic to expect that that motion might be successful." The appellate record does not reveal whether defendant ever filed the motion.

23

introduce the record of the text message between 1129 and Levine from September 2015 through March 24, 2016, the day prior to the drug transaction which killed Levine, to demonstrate the extent of Levine's relationship with defendant.

After oral argument, the trial judge rendered detailed oral findings and concluded as follows:

> Under the totality of these circumstances, . . . the State's motion to admit all of this other crimes or bad acts evidence is granted in part and denied in part. The text messages on and after March 24[, 2016] through and inclusive of April 4[, 2016] are admitted in their entirety. The text messages prior to March 24, 2016 will not be permitted to be admitted in the State's case [in] chief as to their content.
>
> However, the fact that there was a telephone exchange between the defendant and the decedent over an extended period of time will be permitted. So we need to draw that distinction because it is an important one. From September 1 through March 23, the fact that there were text messages and telephone contact between these parties is admissible. The content, the interpretation of those messages inadmissible. In the State's case [in] chief, through [March] 24 and inclusive of April 4 the entirety come in.
>
> Now, in the event the defendant suggests by cross-examination of the State's witnesses by implication by inference or in any other manner suggests third party guilt which he is entitled to do.

24

In that case, this [c]ourt will permit the entirety of that course of conduct including the substance of those conversations and interpretation thereof in its rebuttal case in order to rebut the suggestion of third party guilt.

Clear?

[Defense counsel]: Clear.

Defendant's trial occurred over six days in April 2018. The State presented testimony from fourteen witnesses, including Neiber and Jados. Defendant adduced testimony from a detective at the prosecutor's office. We recount the aspects of the trial relevant to the issues raised on this appeal.

At trial, the State introduced the text message conversation that took place between defendant and Levine on March 24 and 25, 2016. Defense counsel objected on hearsay grounds. In response, the State noted the messages were not hearsay because they were not submitted for their truth.

The trial judge overruled the objection and made the following findings:

[T]here are two exceptions I believe which would permit the introduction of these statements which as I understand the testimony of the witness would be outgoing from . . . Levine's phone and that they are statements by a deceased declarant under [N.J.R.E. 804(b)(6) and (a)(4)].

. . . .

25

But the two things that occur to me which provide exceptions to the exclusionary hearsay rule of one, the statement is made at a time and under circumstances which would evidence its trustworthiness, not for the truth of what is stated, but rather for the fact that it was stated and the source from which it emanated.

And second, the incoming messages from [1129] that phone number if associated with the defendant will come in as either admissions against interest or statements by party opponent. And in order to put those messages in context there needs to be an outgoing to explain the context of the incoming.

In other words, you need to have two sides to the conversation. So I can entertain an application by [defense counsel] for a cautionary instruction to the jury in regard to the decedent's unavailability but I am going to permit the testimony to come in as to the content of this string of text messages . . . .

The judge then instructed the jury as follows:

[Defense counsel] or [the State] in turn have the right to make objections and indeed the obligation to do so when in their opinion it is appropriate. [Defense counsel] makes an objection . . . to that testimony about what . . . Levine said because it's hearsay[. C]learly that's so and I defined hearsay for you yesterday as a statement made by a person not present testifying to the statement and the reason that that's objectionable is because the statement is not subject to the crucible of cross-examination.

You can't test it by saying well, when did you say that, what did you say, what did you mean by it. Okay? And I told you yesterday that there were . . . numerous exceptions to the hearsay rule[,] one of which is where

26

the declarant, the person who is making the statement is unavailable.

Obviously, . . . Levine is unavailable by virtue of his death and so . . . under that exception this testimony will be permitted.

Now, I caution you, however, that the testimony is being admitted not for the truth of what is being said, but for the fact that it was said and there was or may have been a reaction to it.

Now, you might say well, what's the significance of ["H]ey, Chris, how are you doing?["]  Maybe not much but the same rule will apply as we go through these [twenty] messages.

And another exception to the hearsay rule is a statement by a party in this case . . . if it is established that the Chris participating in this text message stream is [defendant] that would get it in.

So if [defendant's] statements come in you can't have those in a vacuum.  You have one side of a conversation.  Okay?  So what . . . Levine said is admitted additionally to put the whole stream of text messages in context.

What they mean will be up to you to determine as the judges of the facts.  . . .

Thereafter, the text messages between Levine and 1129, which we previously recited, were read to the jury.

The State's final witness was the Hunterdon County Medical Examiner who was also a forensic pathologist.  During voir dire, the witness explained his

27

occupational and educational background. He stated he was a doctor of osteopathic medicine and had performed between 2000 and 3000 autopsies during his career and been qualified as an expert in forensic pathology "[twenty] or more times." He also explained the autopsy process. During cross-examination on voir dire, the witness conceded he was not board certified and was not a toxicologist. Defense counsel moved to disqualify the witness from testifying regarding the cause of Levine's death arguing the witness did not practice medicine and had not been qualified a sufficient number of times by the court to render an expert opinion.

The trial judge denied the motion and made the following findings:

> I find that pursuant to the criteria under New Jersey Rules of Evidence 702 [the doctor] has the requisite education, training[,] and experience to be permitted to testify as an expert in the field of . . . forensic pathology, which is defined as the study of the human body and the causes of a death. Further, forensic pathology is not an area of human endeavor that I expect many of the rest of us are familiar with or sufficiently conversant with to understand the study of the body, which may be at issue in this case, or the cause of death of . . . Levine. The fact [that the doctor] is not as busy as other medical examiners that the demands on his time permit him to engage in entrepreneurial pursuits related to, but not strictly within the field of forensic pathology, does not impair his ability, nor does it diminish his capacity to speak to the issues for which he has been called. He was the individual who performed the autopsy in this case. And

28

by virtue of that experience, combined with his professional history, is probably best qualified to tell you what his opinions are as to . . . which he has come to based upon his study of the body of . . . Levine and ultimately his conclusion as to the cause of . . . Levine's death. All of that having been said, the objection is overruled, the doctor is qualified under [N.J.R.E.] 702 as an expert.

Prior to summations, during the charge conference, defense counsel asked the trial judge to charge the jury on the entrapment defense, even though the defense had not previously provided notice it would assert the defense. Defense counsel explained notice of the defense was not raised prior to trial because defendant did not want to open the door to the State to introduce his criminal history. Counsel argued the charge was appropriate because the testimony suggested police could have learned of defendant's identity by seeking to make other arrangements with him aside from the sale of drugs. The State objected and argued if it had received proper notice, it would have tried the case differently, and introduced evidence of defendant's criminal history.

The trial judge denied the request for the charge. The judge found defendant made a strategic decision not to pursue the entrapment defense. The judge noted even though police encouraged defendant's conduct, the evidence showed he was predisposed to selling drugs for profit, which the judge concluded "categorically defeated the defense of entrapment."

The jury convicted defendant of counts one and two under the first indictment, and acquitted on count one under the second indictment. At sentencing, the State moved for an extended term pursuant to N.J.S.A. 2C:43-6(f). The judge noted this was defendant's "tenth indictable conviction . . . most of which [were] for drug-related offenses," in addition to convictions for resisting arrest and aggravated assault, and numerous municipal drug-related offenses and a "laundry list" of other disorderly persons offenses. The judge made the following findings regarding the aggravating and mitigating factors:

> Aggravating factor [three, N.J.S.A. 2C:44-1(a)(3),] the risk that the defendant will commit another offense is clearly implicated here and underscored by [defendant's] frank admission that the problem he has is how to control his urges. And having had decades of opportunity to do that, he has not come upon that formula yet. Clearly, there is a risk that he will commit another offense. Additionally, aggravating factor [six, N.J.S.A. 2C:44-1(a)(6),] applies, and that is the extent of defendant's prior criminal record, which extends over [twenty-three] years and over two dozen offenses. I just counted the dates of offenses. The actual offenses are probably closer to four dozen. But be that as it may, the extent of his prior criminal record, ten indictable convictions, multiple prison sentences and numerous municipal court disorderly persons offenses, too numerous to tick off for the purpose of this proceeding. And number [nine, N.J.S.A. 2C:44-1(a)(9),] the need to deter the defendant particularly and others from violating the law. General deterrence is always present, but in this case it appears that the only way to deter this defendant from violating the law is to remove him from

30

the opportunity to do so, that is to sentence him to imprisonment. There are no mitigating factors which apply. Therefore, the aggravating factors predominate substantially and clearly and convincingly outweigh the non-existing mitigating factors under the compelling circumstances here.

The judge granted the State's motion for an extended term, merged defendant's conviction on conspiracy to possess CDS with the intent to distribute (count one of the first indictment) with the conviction on possession of CDS with the intent to distribute (counts two under both indictments), and dismissed the remaining counts under both indictments. The judge sentenced defendant to a ten-year term of imprisonment subject to a five-year parole ineligibility period.

Defendant raises the following points on appeal:

POINT I
THE IMPROPER TACTICS UTILIZED BY THE POLICE TO ARREST DEFENDANT ON APRIL 4, 2016 CONSTITUTED OBJECTIVE ENTRAPMENT NECESSITATING REVERSAL OF DEFENDANT'S CONVICTION UNDER THE NEW JERSEY CONSTITUTION AND U.S. CONST. AMEND XIV.

POINT II
BECAUSE DEFENDANT'S WAIVER OF HIS RIGHT TO REMAIN SILENT WAS NOT MADE KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY, HIS STATEMENT TO POLICE SHOULD HAVE BEEN SUPPRESSED.

A-5386-17

POINT III
THE DEFENDANT'S MOTION TO SUPPRESS THE SEIZURE OF . . . LEVINE'S CELL PHONE AND THE INFORMATION EXTRACTED FROM IT SHOULD HAVE BEEN GRANTED SINCE THE DEFENDANT'S RIGHT TO BE FREE FROM ILLEGAL SEARCH AND SEIZURE WAS VIOLATED.

POINT IV
[DEFENDANT] WAS DENIED A FAIR TRIAL BY THE COURT'S ERRONEOUS ADMISSION OF THE TEXT MESSAGES ATTRIBUTED TO THE DECEDENT.  (Not raised below).

POINT V
THE COURT'S REPLACEMENT OF DEFENDANT'S PRIVATE ATTORNEY DEPRIVED HIM OF HIS RIGHT TO COUNSEL OF HIS CHOICE.

POINT VI
THE MANDATORY EXTENDED TERM SENTENCE OF TEN . . . YEARS WITH FIVE . . . YEARS OF PAROLE INELIGIBILTY WAS MANIFESTLY EXCESSIVE AND SHOULD BE MODIFIED AND REDUCED.

POINT VII
THE AGGREGATE ERRORS DENIED DEFENDANT A FAIR TRIAL.  (Not raised below).

In his pro se brief, defendant additionally argues:

POINT I
DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE WHAT THE POLICE DID CONSTITUTED DUE PROCESS ENTRAPMENT

32

UNDER NEW JERSEY AND THE UNITED STATES CONSTITUTION.

POINT II
THE MATTER SHOULD BE REMANDED FOR ADDITIONAL FACTUAL FINDINGS AND A NEW DECISION REGARDING SUPPRESSION OF EVIDENCE BECAUSE THE TRIAL COURT DID NOT RESOLVE A CRITICAL FACTUAL QUESTION.

POINT III
DEFENDANT WAS DENIED A FAIR TRIAL BY THE COURT NOT ALLOWING HIM TO PRESENT EVIDENCE OF THIRD-PARTY GUILT.

POINT IV
BECAUSE THE SENTENCING COURT ERRONEOUSLY REJECTED CERTAIN MITIGATING FACTORS IN IMPOSING AN EXTENDED TERM SENTENCE OF [TEN] YEARS WITH [FIVE] YEARS PAROLE INELIGIBILITY, DEFENDANT'S SENTENCE MUST BE MODIFIED AND REDUCED.

POINT V
THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION TO SEVER CHARGES[,] THEREBY DENYING THE DEFENDANT A FAIR TRIAL.

POINT VI
THE JUDGE SHOULD HAVE GRANTED DEFENDANT'S MOTION FOR RECUSAL. THE MATTER SHOULD BE REMANDED FOR A NEW TRIAL, AND, OR SENTENCING IN FRONT OF A DIFFERENT JUDGE.

A-5386-17

POINT VII
DEFENDANT WAS DEPRIVED OF A FAIR TRIAL
DUE TO PROSECUTORIAL MISCONDUCT.

POINT VIII
ALL OF THE AGGREGATE ERRORS DENIED
DEFENDANT OF A FAIR TRIAL.

I.

In his counseled and pro se briefs, defendant challenges his convictions claiming he was entrapped. Defendant argues his convictions should be reversed because the police use of "improper tactics . . . to arrest [him] on April 4, 2016[,] constituted objective entrapment . . . ." Defendant asserts the trial judge "erred in not applying the due process entrapment doctrine." He claims the police conduct was "outrageous," because the police: initiated the crime by contacting him; texted him forty-four times over a three-day period; set up the drug sale and chose the location, date, and amount for purchase; and utilized the SWAT team for his arrest. Defendant asserts police could have learned his identity by offering to lend him money and did not need to lure him into a drug transaction.

Due process entrapment occurs when police engage in conduct that is "patently wrongful in that it constitutes an abuse of lawful power, perverts the proper role of government, and offends principles of fundamental fairness."

34

State v. Johnson, 127 N.J. 458, 473 (1992). Although the burden of disproving the defense falls upon the State, defendant must prove "some evidence of due process entrapment before [that] burden switches to the State." State v. Florez, 134 N.J. 570, 590 (1994).

The court must use "a comprehensive approach encompassing careful scrutiny of the nature of government conduct in light of all the surrounding circumstances 'and in the context of proper law enforcement objectives,'" including:

> (1) whether the government or the defendant was primarily responsible for creating and planning the crime, (2) whether the government or the defendant primarily controlled and directed the commission of the crime, (3) whether objectively viewed the methods used by the government to involve the defendant in the commission of the crime were unreasonable, and (4) whether the government had a legitimate law enforcement purpose in bringing about the crime.
>
> [Johnson, 127 N.J. at 474.]

The Johnson Court noted the hallmarks of entrapment, namely, "[t]actics like heavy-handed pressure, repetitive and persistent solicitation, or threats or other forms of coercion; the use of false and deceitful appeals to such humanitarian instincts as sympathy, friendship, and personal need . . . ." Id. at 478.

A-5386-17

In State v. Davis, 390 N.J. Super. 573, 593 (App. Div. 2007), we upheld a defendant's conviction where police created a persona in order to conduct undercover operations. We held "decoys, traps, and deceptions properly may be used to apprehend those engaged in crime or to obtain evidence of the commission of crime." Ibid. (quoting State v. Rockholt, 96 N.J. 570, 575 (1984)).

The facts adduced here do not reveal outrageous conduct on the part of the police. The text message exchange between defendant and Neiber does not evidence the hallmarks of due process entrapment, namely, that police controlled the exchange, acted unreasonably, or communicated with defendant for an illegitimate purpose. Indeed, defendant was a mutual participant in the conversation. Believing he was communicating with Levine, defendant asked how much heroin he needed and how much money he had. He did not try to end the conversation and was not prevented from doing so.

Moreover, Neiber testified police were not solely trying to identify 1129, but were trying to "confirm[] that 1129 was a drug dealer." Therefore, a conversation about loaning money alone would not have linked the 1129 number to Levine's prior drug transaction. Furthermore, the evidence at trial showed Levine was struggling financially just prior to his overdose. Therefore, Neiber

36

testified if police offered to lend defendant money in exchange for nothing it would have aroused defendant's suspicion.

The utilization of the SWAT team to arrest defendant is irrelevant to the entrapment issue. The encounter with SWAT occurred after defendant had arranged the drug transaction and arrived at Levine's house ready to execute it.

II.

Defendant argues his Miranda rights should have been administered prior to police asking for pedigree information because that information was relevant to the investigation and incriminating. For the first time on appeal, he argues he should have been informed of Levine's death prior to any questioning, and as a result, his statement was not knowing, intelligent, or voluntary.

"[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Elders, 192 N.J. 224, 243 (2007) (citing State v. Locurto, 157 N.J. 463, 474 (1999)). Deference should be given "'to those findings of the trial judge which are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.'" Id. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "A trial court's findings

should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Ibid. (citing Johnson, 42 N.J. at 161).

Police are not required to administer Miranda warnings before questioning to obtain pedigree information even when a defendant is in custody. State v. Melendez, 454 N.J. Super. 445, 457-58 (App. Div. 2018). Considered "ministerial in nature and beyond the right to remain silent," pedigree information falls outside the scope of Miranda. State v. M.L., 253 N.J. Super. 13, 21 (App. Div. 1991). "Even unexpected incriminating statements made by in-custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible." Ibid. "[W]hen Miranda warnings are given after a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination." State v. O'Neill, 193 N.J. 148, 180-81 (2007).

Here, the questions prior to the administration of Miranda warnings elicited pedigree information, and therefore police did not violate defendant's Miranda rights. Moreover, defendant did not make any inculpatory statement

during the pre-warning colloquy. Nothing elicited during the pre-warning interview connected defendant to 1129. Police did not ask defendant about his relationship with Levine until after Miranda warnings were given.

We reject defendant's argument he should have been informed of Levine's death prior to the police questioning him. Although this argument is raised for the first time on appeal, we address it in the interests of justice utilizing the plain error standard. State v. Robinson, 200 N.J. 1, 20 (2009); R. 2:10-2.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. S.S., 229 N.J. 360, 381 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "[T]he prosecution [must] 'prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary . . . .'" State v. A.M., 237 N.J. 384, 397 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

Whether the State has met its burden is evaluated by considering the "totality of the circumstances." Id. at 398 (citing Presha, 163 N.J. at 313). Under this analysis, we consider the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning

A-5386-17

was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." Ibid. (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

A knowing and intelligent waiver requires a defendant to be advised of the nature of his charges. State v. Vincenty, 237 N.J. 122, 132-34 (2019); State v. A.G.D., 178 N.J. 56, 68 (2003). In A.G.D., the Supreme Court suppressed a statement made by the defendant where police had obtained an arrest warrant for A.G.D., but withheld the existence of the warrant from him. Id. at 68. Instead, police told A.G.D. they sought to interview him about allegations of sexual abuse against him without specifying the charges. Id. at 59. Without knowledge that police had an arrest warrant, A.G.D. "insisted that he had done nothing wrong and wanted to put an end to the matter" and gave the police a statement. Ibid. The Court explained

> a criminal complaint and arrest warrant signify that a veil of suspicion is about to be draped on the person, heightening his risk of criminal liability. Without advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission.
>
> [Id. at 68.]

In <u>Vincenty</u>, the Court expanded its ruling in <u>A.G.D.</u>, holding officers must not only inform a defendant an arrest warrant or complaint has been issued or filed but also notify him of the "essence of the charges." 237 N.J. at 134. An officer's failure to properly advise a defendant of the charges will not be considered harmless error where "[s]ome of [a defendant's] statements could be fairly characterized as inculpatory." <u>Id.</u> at 136.

Police deception will not always defeat the voluntariness of a defendant's statement. <u>State v. Baylor</u>, 423 N.J. Super. 578, 588-89 (App. Div. 2011); <u>see also</u> <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990); <u>State v. Manning</u>, 165 N.J. Super. 19, 30-31 (App. Div. 1978). Moreover, we have "decline[d] . . . to hold that the principles announced in <u>A.G.D.</u> extend to also informing an accused of the basis for the arrest warrant, particularly, . . . when [the] defendant well-understood why he was arrested." <u>State v. Henderson</u>, 397 N.J. Super. 398, 404 (App. Div. 2008).

Here, defendant was not solely a suspect at the time of his questioning, and like the defendant in <u>Henderson</u>, he was well-aware he had been arrested for drug activity. Moreover, when he was questioned, defendant was not under arrest for Levine's death. Therefore, police were not required to reveal every facet of the investigation, including informing defendant of Levine's death

41

before issuing his <u>Miranda</u> rights.  The withholding of Levine's death during the questioning did not overbear defendant's will or induce him to provide a false confession.

The totality of the circumstances does not evidence defendant's statement was involuntary.  The motion judge noted defendant was an "intelligent individual," who had previous contacts with law enforcement, and was therefore, "aware . . . of his rights."  The motion judge also noted during the interview the officers were "professional," their tones "remained conversational," and they "did not deliberately mislead" defendant and properly advised him of his rights and indicated a waiver of those rights was not final.  For these reasons, defendant's statement to police was properly admitted at trial.

## III.

In his counseled and pro se briefs, defendant argues the trial judge erred in denying the motion to suppress the seizure of Levine's cell phone and the information extracted from it.  He argues the judge erred when he found "defendant did not establish a reasonable basis to have a subjective expectation of privacy."  Citing <u>State v. Randolph</u>, 228 N.J. 566 (2017), defendant argues "[o]nce the [trial judge] found defendant had standing, there was no longer an issue regarding a reasonable expectation of privacy," and because a valid

A-5386-17

warrant was not issued, the evidence obtained from Levine's phone should have been suppressed.

A search based on a properly obtained warrant is presumed valid. State v. Valencia, 93 N.J. 126, 133 (1983). When a search is conducted pursuant to a warrant, the defendant has the burden of proving "there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable." Ibid. In reviewing such a challenge, we afford "substantial deference" to the discretionary determination resulting in the issuance of the warrant. State v. Marshall, 123 N.J. 1, 72 (1991).

Rule 3:5-3(b) states:

> A . . . judge may issue a search warrant upon sworn oral testimony of an applicant who is not physically present. Such sworn oral testimony may be communicated to the judge by telephone, radio or other means of electronic communication . . . . Subsequent to taking the oath, the applicant must identify himself or herself, specify the purpose of the request and disclose the basis of his or her information. This sworn testimony shall be deemed to be an affidavit for the purposes of issuance of a search warrant. A warrant may issue if the judge is satisfied that exigent circumstances exist sufficient to excuse the failure to obtain a written warrant, and that sufficient grounds for granting the application have been shown.

Since December 1, 2013, Rule 3:5-3(b) does not require exigent circumstances for a telephonic warrant. Notice to the Bar: Telephonic Requests for Search

<u>Warrants for Blood Tests in Driving While Intoxicated (DWI) Cases (Missouri v. McNeely) – Rule Relaxation</u>, 214 N.J.L.J. 794 (Nov. 25, 2013).

Here, police seized Levine's phone because it was discovered in plain view near his body and drug paraphernalia. Police then telephonically applied for the warrant to examine the phone on grounds because Levine died alone, and they did not want word of his death to spread to the perpetrator. Setting aside whether there was an exigency, the motion judge properly denied the motion to suppress the evidence seized from the phone because the circumstances clearly demonstrated probable cause for the telephonic warrant.

Furthermore, as both the motion and trial judges found, the second warrant to enable police to use Levine's phone to contact 1129 was also supported by probable cause. Indeed, the text message conversations between Levine and defendant suggested they had nine narcotics transactions in the six months prior to Levine's death.

The warrant enabling police to use Levine's phone was valid because it fell under an exception to the Wiretap Act. The Act defines an "[i]ntercept" as "the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device . . . ." N.J.S.A. 2A:156A-2(c). When an officer is communicating with a

suspect via electronic communication, the officer is a "party" to the communication, regardless of whether they reveal their identity. See State v. Carbone, 38 N.J. 19, 27 (1962). Conversations may be intercepted if either party to the conversation consents. D'Onofrio v. D'Onofrio, 344 N.J. Super. 147, 154 (App. Div. 2001). Moreover, as already noted, the Act states a wiretap order is not required where the party to the communication is law enforcement. N.J.S.A. 2A:156A-4(b).

## IV.

Defendant argues he was "denied a fair trial by the court's erroneous admission of the text messages attributed to the decedent." He contends the text messages "were hearsay and inadmissible under any of the hearsay exceptions set forth in N.J.R.E. 802." He also asserts the admission was a violation of his constitutional right to confrontation.

"Traditional rules of appellate review require substantial deference to a trial court's evidentiary rulings." State v. Morton, 155 N.J. 383, 453 (1998). The trial judge's rulings will be upheld "absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "An appellate court applying this standard should not substitute its own judgment for

45

that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)); see also State v. Fortin, 189 N.J. 579, 597 (2007). Even if there is an abuse of discretion, we "must then determine whether any error found is harmless or requires reversal." State v. Prall, 231 N.J. 567, 581 (2018).

"Hearsay is generally inadmissible, N.J.R.E. 802, except if it falls within one of the hearsay exceptions." State v. Williams, 169 N.J. 349, 358 (2001) (citing State v. Phelps, 96 N.J. 500, 508 (1984)). If an out of court statement is not offered for the truth of the matter asserted, no exception is necessary. State v. Buda, 195 N.J. 278, 292 (2008).

As the trial judge correctly noted, the text messages attributed to 1129, which the State argued came from defendant, were admissible as a statement by a party opponent pursuant to N.J.R.E. 803(b)(1). The trial judge was also correct in finding Levine's responses to defendant's text messages were not offered for their truth, but rather to give context to the defendant's responses. The judge further advised the jury how to treat Levine's texts and we are unconvinced the judge abused his discretion.

Furthermore, the admission of the evidence is not grounds for reversal because the jury acquitted defendant of the most serious offense; the strict

46

liability for drug-induced death. Therefore, the admission of the texts did not lead to an unjust result.

V.

Defendant argues he was denied the counsel of his choosing when the court "replaced [his] private attorney with the Office of the Public Defender without private counsel moving under R[ule] 1:11-2 . . . ." He claims he was prejudiced because he was unable to enter a plea to the CDS charges and try the strict liability charges.

"The decision whether to relieve counsel is committed to the sound discretion of the trial court, with a presumption against granting the request." State v. Biegenwald, 126 N.J. 1, 21 (1991). "An attorney may withdraw for justifiable and lawful cause, after giving proper notice and obtaining leave of court." State v. Johnson, 274 N.J. Super. 137, 147 (App. Div. 1994) (citation omitted). Counsel may withdraw for "the failure or refusal of a client to pay or secure the proper fees or expenses of the attorney after being seasonably requested to do so." Jacobs v. Pendel, 98 N.J. Super. 252, 255 (App. Div. 1967).

Additionally, RPC 1.16(b)(6) permits an attorney to withdraw from representation where "the representation will result in an unreasonable financial burden on the lawyer . . . ." We have stated "we cannot forget that the literal

47

wording of our <u>Rule</u> permits withdrawal on the basis of an 'unreasonable financial burden' independent of 'material adverse effect on the interests of the client.'" <u>Smith v. R.J. Reynolds Tobacco Co.</u>, 267 N.J. Super. 62, 80 (App. Div. 1993) (citation omitted).

<u>Rule</u> 1:11-2(a) states:

> (1) prior to the entry of a plea in a criminal action . . . an attorney may withdraw upon the client's consent provided a substitution of attorney is filed naming the substituted attorney or indicating that the client will appear pro se. . . .
>
> (2) after the entry of a plea in a criminal action . . . , an attorney may withdraw without leave of court only upon the filing of the client's written consent, a substitution of attorney executed by both the withdrawing attorney and the substituted attorney, a written waiver by all other parties of notice and the right to be heard, and a certification by both the withdrawing attorney and the substituted attorney that the withdrawal and substitution will not cause or result in delay.
>
> (3) In a criminal action, no substitution shall be permitted unless the withdrawing attorney has provided the court with a document certifying that he or she has provided the substituting attorney with the discovery that he or she has received from the prosecutor.

Private defense counsel made the motion to be relieved before the plea proceeding. Therefore, a formal motion was not required. Notwithstanding whether a formal motion was required, the motion judge carefully considered

the parties' positions on the application, including, the State, the public defender who was prepared to substitute as counsel, and defendant. Also, neither defendant nor the public defender raised a concern relating to discovery that would have prevented the court from relieving private defense counsel. We are satisfied the process employed by the motion judge was consistent with Rule 1:11-2(a).

Private defense counsel's withdrawal did not delay defendant's case. Moreover, contrary to defendant's argument, counsel's withdrawal had no effect on plea negotiations; rather the advent of the second indictment and the joinder of the indictments caused the State to change its offer. This would have occurred regardless of whether the motion judge granted defense counsel's motion to be relieved.

Furthermore, defendant did not contest his attorney's assertion that he had not paid him. Nor did he contest counsel's assertion that representing defendant and entering into a plea on the CDS charges, the only case counsel had been retained for, and then have the plea used to convict defendant in the strict liability case, would have been detrimental to defendant. Defendant did not claim the public defender who assumed his representation was unprepared for trial.

A-5386-17

For these reasons, the withdrawal did not prejudice defendant and the motion judge did not abuse his discretion in granting private defense counsel's motion to be relieved. The trial judge also did not err when defendant raised the subject to him for a second time.

## VI.

Defendant argues "the maximum extended term sentence was unduly punitive and should be modified and reduce[d.]" He asserts the trial judge improperly relied upon the circumstances of the strict liability charge in setting the length of his mandatory extended term.

As we noted, the State moved for an extended term sentence pursuant to N.J.S.A. 2C:43-6(f). Because the extended term was mandatory under the statute upon the request of the prosecutor, the court granted the State's motion.

Our "review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We must consider whether the trial court has made findings of fact grounded in "reasonably credible evidence;" whether the factfinder applied "correct legal principles in exercising . . . discretion;" and whether "application of the facts to the law [has resulted in] such a clear error of judgment that it shocks the judicial conscience." State v. Roth, 95 N.J. 334, 363-64 (1984).

50

N.J.S.A. 2C:43-6(f) provides:

> A person convicted of . . . distributing, dispensing or possessing with intent to distribute any dangerous substance or controlled substance analog under [N.J.S.A. ]2C:35-5, . . . who has been previously convicted of . . . distributing, dispensing or possessing with intent to distribute a controlled dangerous substance or controlled substance analog, shall upon application of the prosecuting attorney be sentenced by the court to an extended term[,] . . . notwithstanding that extended terms are ordinarily discretionary with the court.

We reject defendant's argument the sentence is unduly punitive. As the trial judge noted, because of defendant's criminal history, the extended term was statutorily required. Even defense counsel acknowledged at sentencing there was "no case law or anything . . . to . . . counter that [defendant was extended term eligible.]"

Contrary to defendant's argument, the judge did not rely upon the charge on which defendant won acquittal. Although the judge remarked there was "no doubt that the tragic death of [Levine] was a consequence of his drug addiction . . . [and] also no doubt . . . that this addiction was aided and abetted by [defendant]," that comment was not made in support of any aggravating factor or defendant's ultimate sentence. Indeed, the judge stated: "[Defendant's] not . . . penalized by taking the matter to trial, that's his right. . . . In fact, he's

51

benefitted from it and good for him for having the courage of that conviction that the jury would find him not guilty, as it did." Read in context, the judge's remark regarding Levine's addiction and death was a response to the following statement defendant made during sentencing: "I apologize to my friend, Mitch, for not being there for him when he needed someone the most. I apologize to his family for being associated with Mitch's death in any way."

Therefore, taken in context, it was defendant's significant criminal record, which the trial judge discussed at length, not the aforementioned remarks that justified the extended term. We discern no abuse of discretion in defendant's sentence, and it does not shock the conscience.

## VII.

The remaining arguments in defendant's pro se brief are as follows: (1) he was not allowed to present evidence of third-party guilt; (2) the court abused its discretion by denying his motion to sever the strict liability charge from the CDS charges; (3) the court should have granted defendant's motion for recusal; (4) he was denied a fair trial due to prosecutorial misconduct; and (5) the aggregate of all the errors denied him a fair trial. We address these arguments in turn in this section and address the fifth argument in section VIII.

52

A.

We reject defendant's argument he was denied the opportunity to present evidence of third-party guilt. As we recounted, the trial judge's partial exclusion of the text messages prior to the transaction which caused Levine's death did not prejudice defendant because it prevented the jury from hearing evidence of prior bad acts. N.J.R.E. 404(b). More importantly, the judge did not bar defendant from adducing the texts in his case in chief or as rebuttal and instead highlighted that doing so would open the door for the State to adduce prior bad act evidence, namely, a history of drug sales by the person linked to 1129, i.e., defendant. There is no evidence defense counsel misunderstood the judge's ruling because counsel acknowledged it. Rather, the record shows defendant made the decision not to adduce third-party guilt evidence for strategic reasons.

B.

Defendant argues the trial judge erred by denying his motion to sever the strict liability charge from the CDS charges. We disagree.

"The trial court is vested with the discretion to sever any count in an indictment, if joinder would unfairly prejudice a defendant or the State." State v. Silva, 378 N.J. Super. 321, 324 (App. Div. 2005) (citing R. 3:15-2(b)). The denial of such motion "will not result in reversal, absent an abuse of discretion."

53

State v. Cole, 154 N.J. Super. 138, 143 (App. Div. 1977) (citing State v. Yormark, 117 N.J. Super. 315, 331 (App. Div. 1971)).

Pursuant of to Rule 3:7-6, two or more offenses may be charged in the same indictment or accusation if they "are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan." If the joinder of offenses prejudices a defendant, the court may order separate trials or counts, or direct other appropriate relief. R. 3:15-2(b). However, when the offenses charged are the same or similar, based on the same transactions, or of a common plan or scheme, joint trials are preferable in the interest of judicial economy, to avoid inconsistent verdicts, and allow for a "more accurate assessment of relative culpability." State v. Weaver, 219 N.J. 131, 148 (2014) (quoting State v. Brown, 118 N.J. 595, 605 (1990)).

The trial judge should consider whether if the charges were tried separately the evidence of the offenses sought to be severed would be admissible under N.J.R.E. 404(b) in the trial of the remaining charges. State v. Alfano, 305 N.J. Super. 178, 191 (App. Div. 1997). Joinder is permitted if there is a connection between the charges, such that evidence on one charge would be probative of another. State v. Sterling, 215 N.J. 65, 91-92 (2013).

As we noted, the motion judge determined joinder was appropriate pursuant to Rule 3:7-6 because the two indictments arose from the same event and the evidence in one case would "bolster" the State's case in the other. The judge noted that without the context provided by the facts adduced in the CDS distribution case proving who was corresponding with Levine, the jury would be unable to determine culpability in the strict liability case. The judge concluded the probative effect of the evidence outweighed the prejudice to defendant. The decision to join the indictments for trial was not an abuse of discretion. For these reasons, severance was not appropriate under the circumstances.

C.

Defendant asserts he filed a motion on March 8, 2018 to recuse the trial judge on grounds the judge was "appearing to be impartial[] and bias[ed] . . . when he took over the case, and the comment he made during the defendant[']s motion to suppress." Defendant argues the judge heard the motion to suppress "before familiarizing himself with any facts of the case." He also asserts the judge was unconcerned with the issues defendant presented and commented he was supposed to be starting a vacation when he took over the case. Defendant asserts the judge denied the recusal motion and said, "he was going to preside

over the case and that was that."  He argues the court failed to comply with Rule 1:12-3(a).

The appellate record lacks evidence of defendant having filed a motion to recuse the trial judge or a transcript of the proceeding.  Moreover, Rule 1:12-3(a) was inapplicable because it pertains to "[p]roceedings in the [t]rial [c]ourts in the [e]vent of [d]isqualification or [i]nability[,]" and the trial judge had not disqualified himself.  Regardless, the trial judge carefully and meticulously addressed all of defendant's claims and conducted the proceedings in an impartial manner.  Defendant's claims the trial judge was biased against or disinterested in the case lack sufficient merit to warrant further discussion in a written opinion.  R. 2:11-3(e)(2).

### D.

Defendant argues

> the prosecutor engaged in misconduct by filing the motion to join after speaking with his attorney and learning what defendant's strategy was or . . . he got hold of the recorded conversation that defendant had with his attorney, at which time he advised his attorney of his intentions.  Defendant acknowledges that he has no proof of any of this, but the State never mentioned anything about joining the cases before this.  . . .
>
> [Moreover, d]efendant contends that the prosecutor deliberately filed the joinder motion after he assured him on May 5, 2017, that the offer would not

> change from then until he appeared back in court after
> he found out defendant's intentions.

In State v. Bauman, 298 N.J. Super. 176 (App. Div. 1997), we discussed United States v. Goodwin, 457 U.S. 368 (1982), a case in which the United States Supreme Court set forth the legal principles which guide our review here. In Goodwin, the defendant was charged with several misdemeanor and petty offenses. 457 U.S. at 370. After he declined to plead guilty to the charges and requested a jury trial, he was indicted on one felony count of forcibly assaulting a federal officer and three related counts arising from the same incident. Ibid. A jury convicted defendant, and he appealed, arguing the prosecution retaliated against him for exercising his right to a trial. Ibid. The United States Circuit Court of Appeals for the Fourth Circuit agreed and reversed. Ibid.

The Supreme Court reversed the Fourth Circuit and held because the prosecutor possessed discretion in determining the charges during the pretrial phase, defendant was not entitled to a presumption the prosecutor had acted with vindictiveness for charging defendant with greater offenses, and defendant failed to produce evidence to overcome the presumptive validity of the prosecutor's actions in filing the felony charges. Id. at 381. The Court stated:

> There is good reason to be cautious before adopting an
> inflexible presumption of prosecutorial vindictiveness
> in a pretrial setting. In the course of preparing a case

for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins — and certainly by the time a conviction has been obtained — it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor. Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment . . . . It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

[Ibid.]

The Court held as follows:

In declining to apply a presumption of vindictiveness, [we] recognized that "additional" charges obtained by a prosecutor could not necessarily be characterized as an impermissible "penalty." Since charges brought in an original indictment may be abandoned by the prosecutor in the course of plea negotiation — in often

58

what is clearly a "benefit" to the defendant — changes in the charging decision that occur in the context of plea negotiation are an inaccurate measure of improper prosecutorial "vindictiveness." An initial indictment — from which the prosecutor embarks on a course of plea negotiation — does not necessarily define the extent of the legitimate interest in prosecution. For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.

[Id. at 378-80.]

As we recounted, the second indictment came as a consequence of the CDS distribution charges in the first indictment and evidence the State garnered confirming Levine's death was a result of his overdose from heroin defendant sold him. As a result, there was nothing improper about the State's motion to join the indictments and the decision to grant it was sound. The record lacks evidence the second indictment and the joinder of the indictments was in order to prevent defendant from accepting a plea deal.

The record also lacks support for defendant's assertion the indictment on the strict liability offense was retaliatory for defendant's refusal to enter a guilty plea under the first indictment because his guilty plea would have assured the State of a conviction on the strict liability offense. Indeed, the State, not defendant, bore the risk of an unsuccessful outcome at trial because if defendant

59

won an acquittal of the CDS charges it would result in an acquittal under the strict liability charges in the second indictment. Defendant's assertion of prosecutorial misconduct lacks merit to warrant further discussion.

## VIII.

In his counseled and pro se briefs, defendant argues the cumulative effect of the trial errors undermined his rights to due process and a fair trial, warranting reversal of his convictions and sentence. We are unconvinced.

At the outset, we note defendant's pro se brief raises supposed errors not addressed in his counseled brief, which we list herein. Defendant asserts "[t]he court erred by allowing the [S]tate to use the CDS without establishing a chain of custody." He challenges the credibility of the State's witnesses regarding the number of heroin bags recovered from the search of defendant's person. Defendant claims the forensic pathologist who testified for the State was not board certified and therefore could not opine regarding Levine's cause of death, "which his training and experience didn't corroborate." He asserts the trial judge: improperly participated in the questioning of a State's witness; recessed court before another witness could finish answering a cross-examination question by the defense; and "never addressed several motions that the defendant filed. There was a motion for recusal, and severance."

A-5386-17

A harmless error in itself, when combined with another error may have a "cumulative effect [that] can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). "[T]he predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." State v. Wakefield, 190 N.J. 397, 538 (2007).

The cumulative errors alleged in defendant's pro se brief relating to the chain of custody, witness credibility, expert qualification, and the judge's conduct are raised for the first time on appeal. Moreover, defendant fails to cite specifically to the record to support his arguments. As we stated in Spinks v. Township of Clinton, parties have a "responsibility to refer us to specific parts of the record . . . [and] may not discharge that duty by inviting us to search through the record ourselves." 402 N.J. Super. 465, 474-75 (App. Div. 2008) (citing State v. Hild, 148 N.J. Super. 294, 296 (App. Div. 1977)) (finding it improper to request the court to "scour sixty-one pages of plaintiffs' appendix, as well as computer disks[,] without informing [the court] of what particular pages supposedly support their argument."). Notwithstanding these deficiencies, we review defendant's arguments under the plain error standard in the interests of justice. R. 2:10-2.

A-5386-17

Having reviewed the record, we are convinced defendant's arguments lack merit. The credibility of the State's witnesses was a matter for the jury to determine and did not require, as defendant implies, that the trial judge disqualify the witness, acquit defendant, or that we reverse the conviction.

We likewise find no error in the admission of the expert testimony from the forensic pathologist's testimony as to the cause of death. N.J.R.E. 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 703 addresses the foundation for expert testimony and requires expert opinion to "be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).

The forensic pathologist's testimony was critical to helping the jury understand the cause of death without which the State could not prove the strict liability offense. As we noted, the expert's testimony was detailed, both in terms

of explaining his qualifications and experiential knowledge. The expert also explained how he determined the cause of death was a heroin overdose by describing the autopsy and the process of ruling out other health related or foul play causes for Levine's death. The expert explained his review of materials gathered by his office, which were used to determine the time of death, and his review of toxicology reports and evidence of heroin ingestion. For these reasons, the fact the witness was not board certified did not outweigh the substantial evidence showing he was qualified to render an expert opinion.

Regarding the judge's involvement in questioning witnesses, defendant's brief concedes "N.J.R.E. 614 explicitly grants judges the right to question witnesses in accordance with law and subject to the right of a party to make timely objection." Although defendant fails to cite the offending portion of the record, our review of the trial transcripts shows the judge questioned witnesses sparingly and for purposes of clarifying testimony adduced by both parties. Moreover, at no point did defendant object to the judge's questions or seek a sidebar. And, on more than one occasion, the judge reminded the jury it should not place greater weight on the answers to questions he posed than counsel because the jury was the judge of the facts.

A-5386-17

Defendant's argument that the court never addressed his motions is unsupported by the record. As we noted, the record lacks evidence of defendant's motion to recuse the trial judge and defendant's argument for severance of the indictments was adjudicated when the court heard the State's joinder motion.

Our thorough review of the record convinces us defendant's case was handled fairly during the pre-trial and trial phases and there are no grounds for reversal, let alone reversing on a theory of cumulative error, expressed in defendant's counseled and pro se briefs.

IX.

Finally, to the extent we have not addressed an argument raised on this appeal, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5386-17